UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| CLINTON TODD BLACKMON, | ) | Civil Action No.: 4:20-cv-03815-TER |
| | ) | |
| Plaintiff, | ) | |
| | ) | **ORDER** |
| -vs- | ) | |
| | ) | |
| KILOLO KIJAKAZI,[1] | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This is an action brought pursuant to Section 205(g) of the Social Security Act, as amended,

42 U.S.C. Section 405(g), to obtain judicial review of a "final decision" of the Commissioner of

Social Security, denying Plaintiff's claim for disability insurance benefits(DIB) and supplemental

security income(SSI). The only issues before the Court are whether the findings of fact are supported

by substantial evidence and whether proper legal standards have been applied. This action is

proceeding before the undersigned by consent pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. Proc.

R. 73.

## I. RELEVANT BACKGROUND

### A.    Procedural History

Plaintiff filed an application for DIB and SSI on February 15, 2017,with an amended onset

date of January 1, 2017. (Tr. 15). His claims were denied initially and upon reconsideration.

Thereafter, Plaintiff filed a request for a hearing. A hearing was held on November 5, 2019, at which

time Plaintiff and a vocational expert (VE) testified. (Tr. 15). The Administrative Law Judge (ALJ)

---

[1] Kilolo Kijakazi is the Acting Commissioner of Social Security. Pursuant to Fed. R. Civ.
P. 25(d), she is automatically substituted for Defendant Andrew Saul who was the Commissioner
of Social Security when this action was filed.

issued an unfavorable decision on December 3, 2019, finding that Plaintiff was not disabled within the meaning of the Act. (Tr. 26). Plaintiff filed a request for review of the ALJ's decision. The Appeals Council denied the request for review. On October 30, 2020, Plaintiff filed this action. (ECF No. 1).

## B. Plaintiff's Background and Medical History

### 1. Introductory Facts

Plaintiff was born on July 7, 1985, and was thirty years old at the alleged onset date. Plaintiff had past relevant work as an oiler and greaser and an auto service assistant manger. (Tr. 24). Plaintiff alleged disability originally due to sleep apnea, degenerative back disease, high blood pressure, and leg pain. (Tr. 60).

### 2. Medical Records and Opinions[2]

**2017**

On January 28, 2017, Plaintiff presented to the emergency department with back pain. (Tr. 425). Plaintiff complained of chronic lumbosacral pain exacerbated by movement, walking, and bending. (Tr. 426). He denied numbness, tingling, lower extremity weakness, and radiating pain. (Tr. 426). He described the pain as muscular. (Tr. 426). The examining physician noted Plaintiff did not have trouble walking and was in no acute distress. (Tr. 426). Plaintiff displayed right and left paravertebral spasm and had an otherwise normal physical examination. (Tr. 427-28). He was diagnosed with muscle spasm, chronic pain, and low back pain and discharged with pain medication prescriptions. (Tr. 429, 549).

---

[2] Because Plaintiff's allegations of error only relate to his pain and back and knee problems, this medical history is limited to records related to treatment of those issues.

On January 30, 2017, Plaintiff presented to Dr. Lal for a follow-up appointment regarding his back pain. (Tr. 341). Records indicate Plaintiff previously underwent instrumentation fusion and was doing well but started having steadily increasing pain after returning to work. (Tr. 341). Plaintiff reported back and bilateral leg pain. (Tr. 341). Dr. Lal noted Plaintiff had a lot of discomfort, had difficulty walking, could not walk more than 10 yards, and had severe pain when extending his back. (Tr. 341). Assessment was low back pain radiating down leg and thoracic myelopathy. (Tr. 342). Dr. Lal ordered a lumbar spine MRI and continued Plaintiff on his medications. (Tr. 342).

On January 31, 2017, Plaintiff presented to Jill Gilchrist, a nurse practitioner at Plaintiff's pain management clinic, with moderate to severe sharp, achy, and burning back pain. (Tr. 568). Plaintiff reported November 2016 facet joint injections provided 50% pain relief for two months, but had now worn off. (Tr. 568). He reported relief from Percocet and also requested to continue Flexeril, gabapentin, and Mobic. (Tr. 568). Plaintiff reported his modified home exercise program helped tremendously, but stated he was experiencing increased upper lower back pain now that the injection had worn off. (Tr. 568). NP Gilchrist noted he previously had back surgery and was now receiving conservative care, but that those measures were not providing enough relief. (Tr. 569). On examination, NP Gilchrist noted Plaintiff was in moderate distress while sitting upright, exhibited hyperalgesia in the lumbar spine, most prominent at L2–3, had an antalgic gait, and walked with a cane. (Tr. 569). He was assessed with low back pain with radiculopathy, failed back surgery syndrome, and lumbar facet arthrosis. (Tr. 569).

On February 21, 2017, Plaintiff's pain management doctor, Dr. LaTourette, administered a median branch block to see if Plaintiff was a candidate for radiofrequency ablation. (Tr. 564, 609). Plaintiff stated he quit his job because of chronic pain and still had increased pain on facet loading

3

maneuvers. (Tr. 564, 609). He received median branch blocks on the right and left at L2–L3 and reported near complete reduction of pain following the procedure. (Tr. 564, 609). He also exhibited improved range of motion in his lumbar spine. (Tr. 564, 609). Dr. LaTourette noted he would schedule Plaintiff for lumbar spine radiofrequency ablation as soon as possible. (Tr. 564, 609).

On March 21, 2017, Plaintiff underwent a bilateral L2–L3 radiorefrequency ablation. (Tr. 565, 605–06). Prior to the procedure, Plaintiff reported 8/10 pain in his lower back and stated his last median branch blocks provided over 50% pain relief and improved range of motion for three to four hours. (Tr. 565, 605–06). Dr. LaTourette noted Plaintiff had received two of the same injections with good results. (Tr. 565, 605–06). Dr. LaTourette continued Plaintiff on his medications and noted they helped with his pain without significant side effects. (Tr. 565, 605–06).

On June 5, 2017, Plaintiff presented for pain management with NP Gilchrist. (Tr. 807). Plaintiff rated his pain a 5–6/10 and described it as sharp, achy, and burning. (Tr. 807). He indicated the radiofrequency ablation reduced his pain by 50% or greater and made it easier to perform his ADLs. (Tr. 807). Plaintiff reported short-term relief from Percocet. (Tr. 807). NP Gilchrist noted Plaintiff had been to physical therapy, engaged in a modified home exercise program daily, and had spine surgery and that conservative care measures had been in place for a number of years, but Plaintiff continued to experience persistent, severe back and leg pain. (Tr. 807). Plaintiff denied any recent falls and reported increased pain with standing, walking, and prolonged activity and relief with lying down and resting. (Tr. 808).

On examination, NP Gilchrist noted Plaintiff sat upright in the chair and appeared to be in slight distress. (Tr. 808). Plaintiff exhibited hyperalgesia in the lumbar spine and extending to the facet joints and paraspinal muscles bilaterally that NP Gilchrist noted had slightly improved. (Tr.

4

808). Plaintiff had an antalgic gait, difficulty rising from sit to stand, and walked with a straight cane. (Tr. 808). NP Gilchrist assessed low back pain with radiculopathy, lumbar facet arthrosis, and neuropathic-type pain. (Tr. 808-09). She noted these problems remained unstable, but facet arthropathy was somewhat improved. (Tr. 808-09). She continued Plaintiff's medications and instructed him to follow up in two months, or sooner if he desired a therapeutic injection. (Tr. 809).

A July 25, 2017 lumbar spine x-ray showed posterior instrumented fusion from L2 through L4 without hardware complication, no evidence of lumbar spine fracture or acute malalignment, grade 1 retrolisthesis of L2 in relation to L3, and diffuse congenital spinal canal narrowing. (Tr. 758).

On August 7, 2017, Plaintiff presented to NP Gilchrist for pain management. (Tr. 813). Plaintiff reported moderate-to-severe sharp, achy, burning back pain and some occasional numbness in his legs. (Tr. 813). Plaintiff continued to experience 50% relief of his back pain from the March radiofrequency ablation and was much more active as a result. (Tr. 813). However, he now had ongoing leg pain that produced severe pain in his knees and toes. (Tr. 813). Plaintiff reported increased pain with standing, walking, bending, twisting, lifting, pushing, pulling, and crouching. Lying down, resting, and sitting provided relief, as long as he was moving frequently. (Tr. 813). Plaintiff stated he engaged in a modified home exercise program daily, along with stretching and strengthening exercises. (Tr. 813). He tried to stay active because he felt better when active. (Tr. 813). NP Gilchrist noted Plaintiff had used heat and cold therapy and over-the-counter measures in the past. (Tr. 813-14). She stated Plaintiff had been using conservative care measures for numerous years, had back surgery, and continued to have tremendous pain in his back and legs. (Tr. 814). Plaintiff reported an increase in pain and burning. (Tr. 814).

On examination, NP Gilchrist noted Plaintiff sat upright in his chair and appeared in

5

moderate distress. (Tr. 814). She found ongoing hyperalgesia in the lumbar spine extending to the facet joints and paraspinal muscles bilaterally. (Tr. 814). Lumbar flexion and extension both exacerbated Plaintiff's back pain and he had a positive seated straight leg raise on both sides. (Tr. 814). Plaintiff's gait was antalgic and he walked with a cane. (Tr. 814). NP Gilchrist continued his diagnoses and medications and noted Plaintiff was open to another injection or ablation. (Tr. 814–15).

On August 9, 2017, Plaintiff followed up with Dr. Bridges regarding his knee pain. (Tr. 1291). Dr. Bridges assessed osteoarthritis and started him on Meloxicam. (Tr. 1292).

On August 26, 2017, Dr. Griffin performed a consultative orthopedic examination. (Tr. 762). Dr. Griffin noted Plaintiff was morbidly obese and alleged degenerative disc disease of the back, spinal stenosis, and leg pain. (Tr. 762). Plaintiff drove himself to the examination. (Tr. 762). He reported only being able to stand for 15 minutes, frequent falls and back pain, and that walking helped his pain. (Tr. 762). Plaintiff reported progressive, constant, sharp, dull, achy lower back pain that is usually an 8–9/10 in severity. (Tr. 762). He also reported moderate, burning pain radiating down the right side to his ankle that Dr. Griffin noted was consistent with sciatica. (Tr. 762). Plaintiff indicated that pain was only exacerbated by exertion and occurred three to four times per week. (Tr. 762). Plaintiff indicated the pain interfered with his sleep. (Tr. 762). He stated Percocet, stretching, and lying on his back in the fetal position provided relief. (Tr. 762). Dr. Griffin noted Plaintiff was able to sit for 15 minutes and had to stand due to pain during the examination. (Tr. 762). Plaintiff's medications were gabapentin, cyclobenzaprine, oxycodone/acetaminophen, meloxicam, and hydrochlorothiazide. (Tr. 762–63).

Dr. Griffin reviewed operative and treatment notes from Dr. Lal from May and October of

2016. (Tr. 763). Plaintiff's May 2016 back surgery included an L3 laminectomy, L3–L4 facetectomy and decompression of the L3 and L4 nerve roots, L2 laminectomy with decompression of the L3 and L2 nerve roots,  L3–L4 discectomy from the right side, removal of a large central disc herniation, segmentation fixation from L3–L5, and arthrodesis using autograft spine local and infused from L3–5. (Tr. 763). In October 2016, Dr. Lal noted Plaintiff's radicular symptoms had resolved and  his back pain was secondary to scoliosis and severe stenosis. (Tr. 763). Dr. Lal's October 2016 notes also indicated Plaintiff was only experiencing pain while working or performing laborious jobs and not while at home on weekends, even when he did yard work. (Tr. 763).

On examination, Dr. Griffin noted Plaintiff walked with a cane and had a partially staggered gait but did not require the cane for his tandem walk. (Tr. 763). Plaintiff did not wear orthotics or require prosthesis. (Tr. 763). Plaintiff exhibited normal range of motion in his lumbar and cervical spine, elbows, wrists, knees, hips, and ankles and some limitation in shoulder range of motion. (Tr. 764). He had negative sitting and positive supine straight leg raise tests. (Tr. 764). Dr. Griffin noted it was unclear whether his positive supine tests were due to body habitus and that his pain was not consistent with a sciatic distribution. (Tr. 764). Plaintiff's ability to squat was limited by his fear of falling, not pain or limited range of motion. (Tr. 764). Plaintiff's spinal examination showed no tenderness to palpation, muscle spasms, or trigger points. (Tr. 764). Plaintiff's neurological examination was mostly normal, except that his ability to tandem and heel and toe walk were limited. (Tr. 764). Dr. Griffin noted those limitations were due in part to fear and anxiety, not necessarily balance issues. (Tr. 764).

Dr. Griffin opined Plaintiff's back pain was mostly due to scoliosis and could also have an arthritic component. (Tr. 764). He also found Plaintiff's leg pain could be more arthritis than

neuropathic pain. (Tr. 764). Dr. Griffin noted there was no radiological evidence of arthritis in Plaintiff's back or legs but he was prone to osteoarthritis because of his body habitus. (Tr. 764-65). He found much of Plaintiff's inability to perform tasks was due to his poorly controlled anxiety and morbid obesity. (Tr. 765). Regarding functional limitations, Dr. Griffin found no limitations in Plaintiff's ability to lift, carry, push, pull, handling, fingering, overhead reach, environmental exposure, or travel. (Tr. 765). He found mild limitations in Plaintiff's ability to crawl, stoop, bend and kneel, but noted those limitations probably had a psychological, as well as physiological, component. (Tr. 765). He found mild limitations in Plaintiff's ability to sit based on his inability to sit for more than 15 minutes during the examination. (Tr. 765). He found mild limitations in Plaintiff's ability to stand and opined he was probably limited to 15 to 20 minutes of standing. (Tr. 765). He found mild limitations in Plaintiff's ability to walk due to body habitus and pain from osteoarthritis. (Tr. 765).

On August 28, 2017, Plaintiff presented to Dr. Bridges with bilateral knee pain. (Tr. 1288). Dr. Bridges noted crepitance in the right knee and AP drawering in the left. (Tr. 1289). Dr. Bridges assessed osteoarthritis of the knee, started Plaintiff on prednisone, and ordered x-rays. (Tr. 1289).

An August 28, 2017 knee x-ray showed severe appearing joint space narrowing in the patellofemoral compartment and at least mild appearing joint space narrowing in the lateral compartment with marginal osteophyte in all three compartments. (Tr. 842). Plaintiff was assessed with interval degenerative changes, most prominent in the patellofemoral compartment but also seen in the lateral compartment, and subtle marginal spurring in all three compartments. (Tr. 842).

On September 7, 2017 state agency consultant Dr. Lindler opined Plaintiff could occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, stand for a total of two hours, and sit for

a total of six hours in an eight hour workday, did not have any push or pull restrictions, and must periodically alternate sitting and standing to relieve pain and discomfort. (Tr. 66). He further opined Plaintiff could occasionally climb ramps/stairs, balance, stoop, kneel, and crouch and never climb ladders or crawl. (Tr. 67). Dr. Lindler found Plaintiff should avoid concentrated exposure to extreme cold, vibration, and hazards. (Tr. 67-68). He found Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely consistent. (Tr. 68). Dr. Lindler noted Plaintiff's history of degenerative disc disease and spinal stenosis that had been treated with medication, injections, and surgery, including a fusion, and supported his conclusion with a reference to Plaintiff's imaging studies, procedures, exams, and range of motion charts. (Tr. 68).

On September 15, 2017, Plaintiff was seen by Dr. Lal. (Tr. 1325). Plaintiff reported increased difficulty walking, numbness in both legs, numbness in his fourth and fifth digits on both hands, and that he had been dropping things. (Tr. 1325). Plaintiff stated his symptoms had gotten to the point that he could not walk. (Tr. 1325). Dr. Lal noted Plaintiff appeared quite uncomfortable. (Tr. 1325). He found Plaintiff had some weakness in ulnar distributed muscle groups on both sides, left greater than right, and some numbness with ulnar nerve distribution. (Tr. 1325). Plaintiff's gait was flexed forward, he could not flex or extend, and he had numbness in his legs when walking a very short distance. (Tr. 1325). Dr. Lal found no evidence of any upper motor neuron signs or clonus and Plaintiff had a negative Hoffman's sign. (Tr. 1325). Dr. Lal diagnosed low back pain radiating down leg. (Tr. 1326). He noted Plaintiff's symptoms had been progressively worsening over the last year and he needed an MRI of his lumbar spine and nerve conduction studies for ulnar nerve neuropathy. (Tr. 1326).

On September 28, 2017, Plaintiff followed up with NP Gilchrist for pain management. (Tr.

9

857). Plaintiff reported moderate to severe back and leg pain made worse by standing, walking, bending, twisting, lifting, pushing, pulling, and especially prolonged walking. (Tr. 857). Plaintiff had been caring for and going on walks with his daughters and believed this had exacerbated his pain. (Tr. 857). Plaintiff rated his pain a 9/10. (Tr. 858).  NP Gilchrist noted Plaintiff sat upright in his chair and appeared in slight distress. (Tr. 858). At Plaintiff's request, NP Gilchrist re-evaluated Plaintiff's medication regimen and substituted Norflex for Flexeril. (Tr. 858). Muscle spasm was added to his assessed problems. (Tr. 858).

On September 29, 2017, Plaintiff was evaluated for physical therapy for bilateral patellar tendinitis. (Tr. 795). Plaintiff reported experiencing pain in both knees for two years, ever since his knees went through the dashboard in a car accident. (Tr. 795). He reported swelling after activity, especially stairs and bending. (Tr. 795). He reported being told he had arthritis and that he and his doctor were considering injections and surgery, but Plaintiff wanted to try physical therapy first. (Tr. 795). Plaintiff reported using adaptive equipment for his bath tub and that his knees sometimes gave out on him. (Tr. 795). He reported his pain as an 8/10 at its worst and 3/10 at its best. (Tr. 795). He indicated his pain was aggravated by steps and going from sitting to standing and relieved by an ice machine left over from his back surgery. (Tr. 795). Plaintiff described pain and popping in his right knee with extension. (Tr. 795).

On examination, Plaintiff exhibited an antalgic gait on the right, tenderness to palpation on both patella tendons, significant weakness in both lower extremities, and decreased range of motion in the right lower extremity. (Tr. 796). The physical therapist identified the following impairments: ADLs, ambulation, balance, flexibility, gait/locomotion, joint integrity/mobility, muscle performance, pain, range of motion, weakness, and soft tissue mobility. (Tr. 796). She assessed

Plaintiff at 26% of maximal function and recommended twelve physical therapy sessions over the next six weeks. (Tr. 795–96).

From October 4 to October 30, 2017, Plaintiff attended physical therapy seven times. (Tr. 773-803). Throughout this period, Plaintiff rated his pain between a 2 and 9/10, with his right knee either worse than or the same as his left. (Tr. 773-803). At the beginning of his treatment, Plaintiff had difficulty with straight leg raises and complained of back, knee, and shoulder pain during sessions, but was able to increase his range of motion. (Tr. 792-94). On October 11, 2017, Plaintiff attended physical therapy after working for a couple of hours at Mr. Lube. (Tr. 776). He rated his pain a 9/10 and stated he wanted disability and his legs give out when he uses stairs. (Tr. 776). In subsequent sessions, Plaintiff rated his pain a 3–6/10, reported increased pain after exercise or being in the car for thirty minutes and with stairs and twisting. (Tr. 778, 780, 782, 784). The physical therapist noted Plaintiff did not have increased pain during or after sessions when he performed his exercises properly. (Tr. 779, 783). On October 20, 2017, Plaintiff was noted to still be very weak and deconditioned. (Tr. 781). On October 23, 2017, Plaintiff indicated he did not want to do his home exercises because he did not think they helped and he thought he needed surgery. (Tr. 783). On October 30, 2017, Plaintiff self-discharged from physical therapy because he did not have money for gas. (Tr. 787).

On October 6, 2017, Plaintiff underwent a consultative psychological examination by Dr. Whitley. (Tr. 767). Plaintiff drove himself to the examination and reported that he enjoyed going to the lake, swimming, fishing, playing football, and riding in his boat and golf cart. (Tr. 767). Dr. Whitley noted Plaintiff had degenerative disc disease in his back and arthritis in both knees, back, and feet that caused chronic pain. (Tr. 767). Plaintiff indicated his pain was consistently a 6/10 and

made worse by cold and damp weather. (Tr. 767). He also reported pain in his shoulders and hands, poor grasp, and poor neck rotation. (Tr. 767). Regarding his ADLs, Plaintiff reported sometimes requiring assistance dressing, taking medication, or attending appointments. (Tr. 768). He reported spending time with friends and family, riding on his boat, having cookouts with neighbors, and caring for his children. (Tr. 768). He stated he could use a microwave, vacuum, dress and bathe himself, and manage a basic emergency. (Tr. 768). Plaintiff stated he had a drivers license but only drove short distances and only during the daytime. (Tr. 768). He reported poor sleep and not being able to shop due to pain. (Tr. 768-69). Dr. Whitley noted Plaintiff's gait was slow and somewhat hunched over when walking. (Tr. 769). Plaintiff had to stand a few times during the examination because of pain and appeared to be in pain throughout the interview. (Tr. 769).

On October 12, 2017, Dr. Gowans performed a nerve conduction study/electromyography of Plaintiff's extremities. (Tr. 874). Plaintiff complained of bilateral arm and leg pain and cervical and lumbar pain and reported his symptoms had worsened over the past few months. (Tr. 874). On examination, Dr. Gowans found pretty good strength throughout Plaintiff's upper and lower extremities, some tingling in the fourth and fifth digits of both hands, and no upper motor neuron signs. (Tr. 874). The nerve conduction study and EMG showed no electrodiagnostic evidence of a cervical or lumbar radiculopathy, plexopathy, or myopathy; no electrodiagnostic evidence of a peripheral polyneuropathy; and an amplitude drop in the right peroneal nerve above the fibular head when compared to the left peroneal nerve, indicative of a mild axon loss peroneal neuropathy on the right, which Dr. Gowans stated could explain some symptoms down the right leg but not his overall symptoms in both legs. (Tr. 874).

An October 2017 MRI of Plaintiff's lumbar spine showed extensive multi-level spondylosis.

12

(Tr. 876–77). At L5–S1, the MRI revealed a protrusion with associated more focal, very small central right paracentral extrusion inferiorly migrated, right more than left lateral recess stenosis, slight abutment of the right more than left S1 nerve roots, and some degree of neural foraminal narrowing. (Tr. 876–77). The MRI also showed: moderate facet ligamentum flavum hypertrophy, minimal bulging, some mild-to-moderate central lateral recess stenosis, and some mild-to-moderate neural foraminal narrowing at L4–5; mild bulging, mild left lateral recess stenosis, mild post element hypertrophy, and mild foraminal narrowing at L3–4; disc space narrowing and disc osteophyte complex formation, especially on the right, mild-to-moderate left and right neural foramina narrowing, mild central stenosis, moderate right lateral recess stenosis potentially effecting the L3 nerve root at L2–3; some mild ligamentum flavum and minimal facet hypertrophy but no disc bulge herniation mass effect at L1–2; moderate upper lumbar levoscoliosis; and mild lower lumbar dextroscoliosis. (Tr. 876-77).

On November 6, 2017, Plaintiff was seen by Dr. Lal. (Tr. 1327). Plaintiff denied symptoms in his legs and reported pain primarily where he had his surgery. (Tr. 1327). Examination was mostly unremarkable, except for some discomfort in the area of his prior surgery and scoliosis. (Tr. 1327). Dr. Lal diagnosed midline low back pain without sciatica of unspecified chronicity. (Tr. 1327). He noted Plaintiff's nerve conduction studies were negative except for a mild right peroneal nerve palsy and, while the MRI showed some stenosis at L4–5, that was not consistent with where Plaintiff reported pain and so was apparently asymptomatic. (Tr. 1328). Dr. Lal opined there was nothing he could do surgically and Plaintiff should continue to be treated conservatively. (Tr. 1328).

**2018**

On January 4, 2018, Plaintiff told Dr. Bridges his knees no longer hurt. (Tr. 1285).

13

On February 5, 2018, Plaintiff followed up with Dr. Lal and reported fairly significant back pain. (Tr. 1331). Dr. Lal noted Plaintiff continued to have problems with ambulation, but that his problems could also relate to a recent surgery and wound VAC for an abscess in Plaintiff's right groin. (Tr. 1331). Dr. Lal continued his diagnoses, noted Plaintiff was seeing pain management, and informed Plaintiff he would need to lose a significant amount of weight to do well in the long run. (Tr. 1331–32).

On March 26, 2018, Plaintiff was seen by NP Gilchrist. (Tr. 1379). He reported constant aching, dull pain in his mid and lower back rated a 7/10. (Tr. 1379). He reported some benefit from his modified home exercise program, conservative care measures, OTC medications, and stretching and strengthening exercises. (Tr. 1379). He stated standing, walking, bending, twisting, prolonged positions, and lifting increased his pain and lying down and resting reduced his pain. (Tr. 1379). He reported relief from Percocet and his other pain medications. (Tr. 1379). On examination, NP Gilchrist noted an abnormal gait; right thoracic prominence in the Adams forward bending test; lumbar tenderness; mildly limited and painful extension, flexion, lateral bend, and rotation; positive Gower's spinal rhythm; and back pain with straight leg raise on both sides. (Tr. 1382–83). She assessed lumbar radiculopathy, post laminectomy syndrome, and muscle spasm, encouraged Plaintiff to continue his home exercise program, and prescribed Percocet and Flexeril. (Tr. 1383).

On April 9, 2018, state agency consultant Dr. Heldrich found the evidence did not support Plaintiff's allegations that his spinal impairment had worsened because he had not had any recent treatment for that condition. (Tr. 95). Rather, Plaintiff had been treated for repeated MRSA infections. (Tr. 95). Dr. Heldrich concluded the functional assessment at the initial level was consistent with and supported by the new and material evidence. (Tr. 95).

On June 29, 2018, Plaintiff was seen by NP Gilchrist and reported increased neuropathy in his legs that interfered with his sleep. (Tr. 1384). On examination, NP Gilchrist found lumbar tenderness; sagittally imbalanced upright stance; mildly limited and painful extension, flexion, lateral bend, and rotation; positive Gower's spinal rhythm; abnormal gait; and back pain with straight leg raise on both sides. (Tr. 1387-88). She discussed the possibility of additional injections and noted they had helped in the past and provided long-lasting benefit. (Tr. 1385). She encouraged Plaintiff to continue with his home exercise program and prescribed Percocet. (Tr. 1388).

On August 29, 2018, Plaintiff had a hypotensive episode and had to be admitted to the hospital. (Tr. 1340). Plaintiff indicated he had been working in his yard in the heat for approximately five hours. (Tr. 1340).

On September 28, 2018, Plaintiff presented to NP Gilchrist with complaints of sharp, aching, throbbing lower back pain radiating to both legs, numbness in his feet and the backs of his legs, and pins and needles in his feet. (Tr. 1392). Plaintiff rated his pain a 7/10. (Tr. 1392). He and NP Gilchrist again discussed the possibility of future injections and Plaintiff mentioned he would be interested in another radiofrequency ablation as the effects from that had now worn off. (Tr. 1393). On examination, NP Gilchrist noted tender lumbar facets at L2–3; sagittally imbalanced upright stance; mildly limited and painful extension, flexion, lateral bend, and rotation; positive Gower's spinal rhythm; back pain with straight leg raises on both sides; and abnormal gait. (Tr. 1395-96). She assessed postlaminectomy syndrome of lumbar region, lumbar radiculopathy, neuropathy involving both lower extremities, and facet degeneration of lumbar region. (Tr. 1396). She continued Plaintiff on Percocet, switched Gabapentin for Lyrica, and planned to schedule a radiofrequency ablation of L2–3. (Tr. 1396).

On December 28, 2018, Plaintiff returned to NP Gilchrist and reported worsening pain since his last medication adjustment. (Tr. 1397). He reported constant sharp, aching pain in his lower back rated a 10/10. (Tr. 1397). Plaintiff reported no noticeable relief from his medications and admitted to overtaking his medicine because of his severe pain. (Tr. 1398). The relief Plaintiff experienced after the ablation had completely worn off and the pain was preventing him from performing ADLs and reducing his quality of life. (Tr. 1398). On examination, NP Gilchrist noted lumbar tenderness; mildly limited and painful extension, flexion, lateral bend, and rotation; back pain with straight leg raise on both sides; and abnormal gait. (Tr. 1399). She assessed lumbar radiculopathy, post laminectomy syndrome, and lumbar facet arthropathy. (Tr. 1401).

**2019**

On January 17, 2019, Dr. Latourette performed another bilateral L2–3 radiofrequency ablation. (Tr. 1403). Dr. Latourette noted Plaintiff had a multilevel fusion with modest degenerative disc disease and facet arthropathy above his fusion at L2–3. (Tr. 1403). Plaintiff denied new numbness or weakness in his lower extremities and continued to exhibit increased pain on facet loading maneuvers with tenderness over the lower lumbar facets. (Tr. 1403). Plaintiff also requested an increase in pain medication and stated the pain was causing his weight gain but Dr. Latourette expressed concern regarding many of Plaintiff's secondary problems, like low testosterone and the risk of using opiates with sleep apnea, and would not increase his medication. (Tr. 1404).

On February 6, 2019, Plaintiff followed up with NP Gilchrist and reported mid to lower back pain that he rated a 9/10. (Tr. 1407). Plaintiff indicated the radiofrequency ablation reduced his back pain by greater than 50% and that he continued to experience relief. (Tr. 1408). He stated narcotics improved his quality of life and activity level. (Tr. 1408). On examination, NP Gilchrist noted

lumbar tenderness; mildly limited and painful extension, flexion, lateral bend, and rotation; back pain with straight leg raise on both sides; and abnormal gait. (Tr. 1410-11). She encouraged Plaintiff to continue with his home exercise program and prescribed Percocet. (Tr. 1411).

On April 12, 2019, Plaintiff presented to Dr. McFarland with complaints of bilateral knee pain. (Tr. 1435). Plaintiff reported experiencing anterior and medial knee pain for years that had gradually worsened. (Tr. 1435). He stated he was evaluated in September 2017 and recommended for surgery. (Tr. 1435). He reported undergoing physical therapy with minimal improvement. (Tr. 1435). On examination, Dr. McFarland found no obvious deformity, non-antalgic gait, no evidence of effusion, positive crepitus with McMurray and patellar grind, decreased patellar range of motion on the left, no tenderness, no evidence of patellar instability, no weakness, no laxity with varus or valgus stress, negative anterior and posterior drawer tests, intact lower quarter stability, sensation grossly intact, and neurovascularly intact. (Tr. 1436). X-rays of Plaintiff's knees showed tricompartmental grade 4 osteoarthritis in the left knee and grade 3 arthritis in the right knee. (Tr. 1435). Dr. McFarland informed Plaintiff he would need surgery eventually. (Tr. 1435). They agreed to try injections first to delay surgery as long as possible. (Tr. 1435).

On May 2, 2019, Plaintiff followed up with NP Gilchrist and reported mid and lower back and bilateral leg pain rated a 6/10. (Tr. 1413). He continued to have some relief from the radiofrequency ablation but felt that relief was waning. (Tr. 1413). Plaintiff stated he was not interested in additional surgery or physical therapy and would like to try another injection. (Tr. 1413-14). His symptoms were unchanged on examination and NP Gilchrist continued him on Percocet and Gabapentin. (Tr. 1416-18). On July 24, 2019, Plaintiff received an injection in both knees and reported an immediate improvement in pain. (Tr. 1444-45).

On August 20, 2019, Plaintiff was seen by NP Gilchrist and reported low back and left hip, thigh, and calf pain rated a 6/10. (Tr. 1419). Plaintiff also reported numbness in his left heel and new pain in his left forearm radiating to his hand. (Tr. 1419). He continued to indicate that standing, walking, bending, twisting, lifting, and prolonged positions increased his pain and lying down and resting reduced his pain. (Tr. 1420). He also reported relief from his medications and injection therapy. (Tr. 1420). Examination of Plaintiff's shoulders, elbows, wrists, and hands revealed less than full strength bilaterally. (Tr. 1423-24). NP Gilchrist noted Plaintiff displayed hyperalgesia in the left upper extremity primarily from the elbow to the wrist. (Tr. 1424). In addition, Plaintiff exhibited abnormal grip strength bilaterally, but normal range of motion in his wrists. (Tr. 1424). Plaintiff's back examination continued to show lumbar tenderness; mildly limited and painful extension, flexion, lateral bend, and rotation; back pain with straight leg raises on both sides; and abnormal gait. (Tr. 1425). NP Gilchrist assessed lumbar radiculopathy, postlaminectomy syndrome of the lumbar region, and lumbar spondylosis. (Tr. 1425). She continued Plaintiff on Percocet and Gabapentin and ordered an EMG nerve conduction study of Plaintiff's left upper extremity. (Tr. 1426).

On August 22, 2019, Plaintiff had his knee pain evaluated again. (Tr. 1446). Examination showed tenderness to palpation of the bilateral medial joint line space and inferior pole of the right patella, positive patellar grind on the right more than the left, negative McMurray's bilaterally, full lower extremity motor strength bilaterally, and intact sensation. (Tr. 1446). Plaintiff received bilateral prolotherapy intra-articular knee injections and reported immediate improvement in pain. (Tr. 1447-48). He was instructed to follow up in six to eight weeks for additional injections and continue light exercises and home exercises previously prescribed. (Tr. 1447).

On October 23, 2019, NP Gilchrist completed a form for Plaintiff's insurance company

indicating he was unable to work due to disability from October 1, 2019 to October 1, 2020 because of his lumbar radiculopathy and would never be able to return to work. (Tr. 1453).

On October 24, 2019, NP Gilchrist completed a questionnaire regarding Plaintiff's pain. (Tr. 1450–51). Upon exam or testing, Plaintiff had neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss, sensory or reflex loss, positive straight leg raise test, severe burning or painful dysesthesia, need to change position more than once every two hours, lumbar spinal stenosis, and inability to ambulate effectively. (Tr. 1450). NP Gilchrist opined Plaintiff suffered from severe pain and could stand for 15 minutes at one time, stand for 60 minutes in a workday, sit for 15 minutes at one time, sit for 60 minutes in a workday, lift 10 pounds on an occasional basis, not lift on a frequent basis, and occasionally bend and stoop. (Tr. 1450). She indicated Plaintiff needed a job that permitted shifting positions at will between sitting, standing, or walking; would need to take 15 minute unscheduled breaks three to four times in a work day due to his severe back, neck, and leg pain; and would likely be absent from work three days per month. (Tr. 1451).

## C.    The Administrative Proceedings

### 1.    The Administrative Hearing

#### a.    Plaintiff's Testimony

On November 5, 2019, Plaintiff appeared at a hearing before ALJ Petri.  Plaintiff was represented by an attorney.  (Tr. 32).  Dr. Washington, Ph.D. testified as an impartial vocational expert (VE).  (Tr. 32).

Plaintiff reported his height and weight as 6'3" and 350 pounds. (Tr. 38). He was married and lived with his wife and two daughters, who were eleven and thirteen. (Tr. 38-39). Plaintiff had a drivers license; however, his tag was expired and he had not renewed it because his pain prevented him from leaving the house much. (Tr. 39). He reported driving sometimes to pick up his daughters

from school. (Tr. 39). Plaintiff testified he worked for a long time at Mr. Lube, checking and changing oil and then as an assistant manager. (Tr. 40-41). Plaintiff stated he quit his job as a manager because he could not keep up with everybody. (Tr. 40). He went back to work there but had to quit again because he could not bend over to pick up trash. (Tr. 40). Plaintiff had a cane at the hearing and stated he had been using a cane, on and off, for over a year because his left leg sometimes went out on him, causing him to fall. (Tr. 42-43). He stated he last fell about one month before the hearing. (Tr. 43). Plaintiff's medications included two types of blood pressure medication, Percocet, Neurontin, and muscle relaxers. (Tr. 43).    Plaintiff testified his primary problem was his back. (Tr. 44). He described pain in his mid and lower back that radiated down his sciatic nerve into his legs. (Tr. 44). Plaintiff underwent surgery in 2016 but the surgery did not help. (Tr. 44–45). Plaintiff testified he regularly treated with a pain center and had tried injections and nerve ablations for his back pain. (Tr. 45). The ablations helped the first time, but subsequent ablations had not helped. (Tr. 45)., Plaintiff testified he experienced knee problems off and on due to playing football. (Tr. 46). Then, he was in a car accident in 2016, his knees went through the dashboard, and now they never stop hurting. (Tr. 46). Plaintiff stated he had received injections in his knees and was awaiting approval for another procedure. (Tr. 46).

Plaintiff had also been experiencing arthritis in his hands and carpal tunnel symptoms over the past year. (Tr. 47). In addition, he testified nerve tests about one month prior to the hearing revealed nerve damage in his arms and legs. (Tr. 47). He described radiating pain on one side of his arm and weakness in his left arm and hand that sometimes made it difficult to hold his cane. (Tr. 47-48). Plaintiff reported trouble sleeping because of the pain. (Tr. 48). He indicated he only slept for a few hours at a time and slept a lot during the day. (Tr. 48). Plaintiff testified the most comfortable position for him was laying back in a recliner. (Tr. 48). He stated he normally spent more than half

his day in the recliner but would need to get up and walk around when he started hurting. (Tr. 48). Plaintiff testified he could sit comfortably in a straight-backed chair for five or ten minutes. (Tr. 48-49). He stated he had trouble walking 20 feet from his house to his car and had to place a chair halfway in between so he could stop and rest. (Tr. 49). Plaintiff testified he had some trouble with the four steps leading up to his house and had to use the railing to go up them. (Tr. 49). He stated he could only stand in one spot for a few minutes and that it was better for him to try to walk around. (Tr. 49-50). He testified a doctor restricted him to lifting ten pounds, but Plaintiff stated he could not lift a gallon of milk without pain. (Tr. 50). He testified he could probably walk with a half-full gallon of milk. (Tr. 50).

Regarding his activities of daily living, Plaintiff testified he could not stand long enough to cook, but could prepare oatmeal or canned foods; could not do any yard work; could place clothes in the washing machine, but could not lean over to get them out; and could go grocery shopping but would be in a lot of pain afterwards so he tried not to. (Tr. 50-51). He stated he tried to walk with his daughters but could not make it much past the end of his driveway before needing to turn around. (Tr. 51–52). Plaintiff testified he had trouble getting into his truck and could only sit in a car for ten minutes before needing to get out and stretch. (Tr. 52). He stated he used to enjoy taking his boat out on the lake and attending church, but could not do either anymore because of his back pain. (Tr. 53). Plaintiff testified he regularly saw a family doctor, pain management, a knee doctor, and an endocrinologist. (Tr. 53–54). He stated his medications made him sleepy. (Tr. 54).

### b.    Vocational Evidence

The VE classified Plaintiff's past work as an oiler and greaser as medium work with an SVP of 3. (Tr. 55). His work as an assistant manager was sedentary work with an SVP of 8, but the VE stated Plaintiff was likely performing the position as a light or medium level with an SVP of 5 or 6.

(Tr. 55). The VE testified a hypothetical individual of Plaintiff's age, education, and experience limited to sedentary work, who could never climb ladders, ropes or scaffolds; occasionally climb ramps or stairs, balance, stoop, kneel, or crouch; never crawl; and have frequent exposure to extreme cold, excessive vibration, and workplace hazards would be excluded from Plaintiff's PRW. (Tr. 55-56). However, the hypothetical individual could perform work as a telephone quotation clerk, table worker, or addresser, all of which are classified as sedentary, unskilled work with an SVP of 2. (Tr. 56). The VE testified the hypothetical individual could perform the same work if he required a handheld assistive device for prolonged ambulation or uneven terrain, but that the number of available jobs would decrease by about 40%. (Tr. 56–57). The VE further stated the hypothetical individual would be precluded from work if he was off task 15% or more of a work day in addition to regularly scheduled breaks. (Tr. 57). The hypothetical individual would also be precluded from work if he was absent two or more days per month. (Tr. 58).

**2.    The ALJ's Decision**

In the decision of December 3, 2019, the ALJ made the following findings of fact and conclusions of law (Tr. 15):

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2021.

2.    The claimant has not engaged in substantial gainful activity since January 1, 2017, the amended alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq.*).

3.    The claimant has the following severe impairments: lumbar degenerative disc disease, degenerative joint disease of the knees, and obesity (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except he can never climb ladders, ropes or scaffolds; never crawl; occasionally climb ramps and stairs; occasionally balance, stoop, kneel, and crouch; have frequent exposure to extreme cold, excessive vibration, and workplace hazards; and requires a hand held assistive device for prolonged ambulation and uneven terrain.

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.      The claimant was born on July 7, 1985 and was 30 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.      The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from January 1, 2017, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

## II. DISCUSSION

Plaintiff argues the ALJ erred in performing the subjective symptom evaluation. Plaintiff argues the ALJ failed to determine the RFC in a function by function manner. Plaintiff argues the ALJ failed to properly weigh NP Gilchrist's opinion.  Defendant argues substantial evidence supports the ALJ's findings in all respects.

## A.    LEGAL FRAMEWORK

### 1.     The Commissioner's Determination–of–Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as: the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months. 42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting the "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity ("SGA"); (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[3] (4) whether such impairment prevents claimant from performing PRW;[4] and (5)

---

[3] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[4] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

whether the impairment prevents him from doing SGA.  *See* 20 C.F.R. § 404.1520.  These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis.  If a decision regarding disability may be made at any step, no further inquiry is necessary.  20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work.  See 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82–62 (1982).  The claimant bears the burden of establishing his inability to work within the meaning of the Act.  42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy.  To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW.  *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002).  If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work.  *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

## 2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [ ] made after a hearing to which he was a party."  42 U.S.C. § 405(g).  The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner

25

are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*; *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases *de novo* or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157-58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir.1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157-58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). Substantial evidence as a threshold is "not high;" "[u]nder the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

**B.    ANALYSIS**

**Subjective Symptom Evaluation**

Plaintiff asserts the ALJ cherry-picked evidence discounting his allegations of pain and overlooked evidence that Plaintiff's symptoms were not well-managed and he remained in considerable pain. (ECF No. 17 at 20–23). In particular, Plaintiff contends the ALJ failed to consider his reported pain levels; remarks from his doctors regarding his apparent pain and discomfort;

objective evidence of his back problems, including abnormal gait, positive straight leg raise tests, and problems with his stance; his scoliosis, associated pain, and how it contributed to his overall pain; and his persistent attempts to obtain relief. (ECF No. 17 at 16–23).

SSR 16-3p is applicable to cases decided after its effective date, such as this case. *See Morton v. Berryhill*, No. 8:16-cv-0232-MBS, 2017 WL 1044847, *3 (D.S.C. Mar. 20, 2017). Although SSR16-3p eliminates usage of the term "credibility" because the regulations do not use the term, the assessment and evaluation of Plaintiff's symptoms requires usage of most of the same factors considered under SSR 96-7p.

Under *Craig v. Chater*, 76 F.3d 585, 591-96 (4th Cir. 1996), subjective complaints are evaluated in two steps. First, there must be documentation by objective medical evidence of the presence of an underlying impairment that would reasonably be expected to cause the subjective complaints of the severity and persistence alleged. Not until such underlying impairment is deemed established does the fact-finder proceed to the second step: consideration of the entire record, including objective and subjective evidence, to evaluate the intensity and persistence of symptoms to determine how symptoms limit capacity for work. *See also* 20 C.F.R. § 404.1529; SSR16-3p, *4.

The ALJ may choose to reject a claimant's testimony regarding his condition, but the ALJ must explain the basis for such rejection to ensure that the decision is sufficiently supported by substantial evidence. *Hatcher v. Sec'y, Dep't of Health & Human Servs.*, 898 F.2d 21, 23 (4th Cir. 1989) (quoting *Smith v. Schweiker*, 719 F.2d 723, 725 n.2 (4th Cir. 1984)). A claimant's allegations "need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers[.]" *Craig*, 76 F.3d at 595. The ALJ considers the evidence in the record as a whole when analyzing Plaintiff's claims, as does

this court when reviewing the ALJ's decision. *See id.*; *see* SSR 16-3p, at *4.

A claimant's statements about intensity, persistence, and limiting effects of symptoms, which are inconsistent with the objective medical evidence and other evidence, are less likely to reduce her capacity to perform work related activities. SSR 16-3p, at *7; 20 C.F.R. § 404.1529(c). An individual's symptoms are evaluated based on consideration of objective medical evidence, an individual's statements directly to the Administration, or to medical sources or other sources, and the following factors:

1. Daily activities;
2. The location, duration, frequency, and intensity of pain or other symptoms;
3. Factors that precipitate and aggravate the symptoms;
4. The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;
5. Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms;
6. Any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
7. Any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

SSR 16-3p, at *7; 20 C.F.R. § 404.1529(c). The ALJ at step three is to "consider the individual's symptoms when determining his or her residual functional capacity and the extent to which the individual's impairment-related symptoms are consistent with the evidence in the record." SSR 16-3p, at *11.

The ALJ considered Plaintiff's allegations, stating:

The claimant alleged disability due to degenerative back disease and leg pain. Side effects reported due to medications included sleepiness, drowsiness and difficulty with concentration and memory. He stated that his impairments affected his ability to lift, squat, bend, stand, reach, walk, sit, kneel, stair climb, remember, complete tasks, concentrate, understand, follow instructions, and get along with others. The claimant reported that how far he could walk depended on his pain level. He reported using a walker or cane to assist with ambulation because his legs give out on him.

(Exhibits 2E; 3E; 9E; 10E; 13E)

At the hearing, the claimant testified that he was 6 feet, 3 inches tall and weighed 350 pounds. He reported that his weight was currently stable. He lived with his wife and two children, ages 11 and 13. The claimant testified that he quit his last job because he could not bend over; he reported using a cane on and off a little over a year, which he used when he left his house and sometimes at home. He stated that he used a cane to prevent falling because his legs gave out on him. Treatment has included pain medications and muscle relaxers for mid to lower back pain that radiates down his leg. He reported having surgery on his back in 2016, but stated that it did not help and caused more problems. Subsequent treatments for his back pain have also included injections and ablations. In addition to his back condition, the claimant testified that he had nerve damage in his arms and legs resulting in weakness in his arms. He stated that he could sit for five to ten minutes, walk ten feet before needing to stop and rest, stand for a few minutes, and lift no more than 10 pounds. With respect to activities of daily living, the claimant reported that he prepared simple meals such as oatmeal, put laundry in the washer, and shopped at the store while riding in a cart.

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

As for the claimant's statements about the intensity, persistence, and limiting effects of [his] symptoms, they are **inconsistent with the evidence of record showing generally conservative treatment with <u>well-managed symptoms</u>**.

(Tr. 21)(emphasis added).

Regarding Plaintiff's back pain, the ALJ supported her finding with references to Plaintiff's February and March 2017 median branch block and radiofrequency ablation, July 2017 lumbar spine x-ray showing grade 1 retrolisthesis of L2 in relation to L3 and diffuse congenital spinal canal narrowing, November 2017 nerve conduction study showing only mild right peroneal nerve palsy and Dr. Lal's note that nothing could be done surgically, continual treatment with medication, and warnings that Plaintiff needed to lose weight in order to get better, along with a relatively expansive

discussion of Dr. Griffin's consultative examination. (Tr. 21-23). In addition, the ALJ found: "While the claimant alleges worsening symptoms due to his back condition with increased pain and falling, subsequent records show mainly treatment and hospitalization for repeated MRSA infections and upper respiratory infection that have responded appropriately to treatment." (Tr. 22).

Regarding Plaintiff's knee pain, the ALJ cited Plaintiff's August 2017 x-ray showing degenerative changes, physical therapy and subsequent self-discharge, January 2018 report of no knee pain, treatment with medication, April 2019 x-ray showing tricompartmental grade 4 osteoarthritis in the left knee and grade 3 arthritis in the right knee, and advice that Plaintiff would need knee surgery at some point but Plaintiff's opting for injections in order to delay surgery. (Tr. 22–23).

The ALJ concluded:

> Overall, the evidence of record as a whole does not support a finding of debilitating impairments. The evidence of record shows that the claimant's complaint of back pain radiating to the legs as well as bilateral knee pain, likely exacerbated by morbid obesity, has **received conservative treatment during the relevant period, which has provided symptom relief**.

(Tr. 23)(emphasis added).

Absent from the ALJ's analysis of Plaintiff's alleged pain is any discussion of his pain management treatment with NP Gilchrist.[5] Plaintiff treated with NP Gilchrist regularly throughout the relevant period and the records related to that treatment contain pertinent information to analysis under SSR 16-3p not found elsewhere in the record or discussed in the decision— like the exact

---

[5] NP Gilchrist's treatment records are found in Exhibit 5F at pages 21–23, Exhibit 11F at pages 4–6, 10–11, and 54–55 and Exhibit 19F.  The ALJ cites these records only when explaining that Plaintiff was prescribed a branch block, radiofrequency ablation, and pain medications in early 2017, later mainly received treatment for MRSA and upper respiratory infections, self-discharged from physical therapy, and that Plaintiff continued to be treated conservatively with prescribed medications. (Tr. 21-22).

location and intensity of Plaintiff's pain; factors that precipitate, aggravate, and relieve his pain; the type, dosage, and effectiveness of his medication; and treatments other than medication Plaintiff has used.

Plaintiff treated with NP Gilchrist every three months and consistently reported moderate to severe back and leg pain, rated from a 5 to 10/10, even after receiving greater than 50% relief from injections, branch blocks, and radiofrequency ablation. (Tr. 807, 858, 1384, 1392-93, 1397-98). In addition, NP Gilchrist noted on several occasions that Plaintiff was getting only some or no relief from conservative measures and medication and his problems remained unstable. (Tr. 807, 808–09, 814, 857, 1379). NP Gilchrist's examinations also reveal objective evidence related to Plaintiff's impairment, including gait problems, myalgias, positive straight leg raise tests, and mildly limited range of motion. (*See*, *e.g.*,  Tr. 1379-1426).The ALJ also omits any reference to Plaintiff's January 2019 radiofrequency ablation, which Plaintiff reported provided greater than 50% relief initially, but indicated the effects began to wane by May 2019, leaving him with 6/10 pain again. (Tr. 1403-04, 1407-08, 1413-14, 1419-20).

Without meaningful discussion of these records, the court cannot find the ALJ properly considered all of the evidence or decipher how she resolved apparent inconsistencies. *See Gordon v. Schweiker*, 725 F.2d 231, 235–36 (4th Cir. 1984) (the ALJ is obligated to consider all evidence, not just that which is helpful to her decision) ; *Murphy v. Bowen*, 810 F.2d 433, 437 (4th Cir. 1987). Examination of Plaintiff's pain management treatment appears particularly relevant in this case. The ALJ's failure to consider or discuss the above records does not provide a logical bridge between her finding that Plaintiff's allegations are inconsistent with the record evidence and, specifically, that Plaintiff's pain was resolved with conservative treatment or that symptoms were well-managed or

relieved.

Because the court finds the ALJ's analysis with respect to the above issue is a sufficient basis to remand the case to the Commissioner, the undersigned does not specifically address Plaintiff's additional allegations of error. *See Boone v. Barnhart*, 353 F.3d 203, 211 n.19 (3d cir. 2003) (remanding on other grounds and declining to address claimant's additional arguments). However, the Commissioner's evaluation of Plaintiff's subjective symptoms necessarily relates to Plaintiff's other claims before the court. Thus, upon remand, the Commissioner should consider each of Plaintiff's allegations of error, including but not limited to: the RFC determination, the subjective symptom evaluation, and consideration of NP Gilchrist's opinion.

### III. CONCLUSION

In conclusion, it may well be that substantial evidence exists to support the Commissioner's decision in the instant case. The court cannot, however, conduct a proper review based on the record presented. Accordingly, pursuant to the power of the Court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in social security actions under sentence four of Sections 205(g) and 1631(c)(3) of the Social Security Act, 42 U.S.C. Sections 405(g) and 1338(c)(3), the Commissioner's decision is reversed and this matter is REMANDED to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings in accordance with this opinion.

s/ Thomas E. Rogers, III

October 25, 2021                                      Thomas E. Rogers, III
Florence, South Carolina                             United States Magistrate Judge